**AIRLINES REPORTING CORPORATION,**
Plaintiff,

v.

**INTER TRANSIT TRAVEL, INC., and Luis R. Fuksman, Defendants.**

No. 93–CV–0397 (DRH).

United States District Court,
E.D. New York.

April 21, 1995.

Coffinas & Coffinas by George Coffinas, Brooklyn, NY, for plaintiff.

Omar Lopera, New York City, for defendants.

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*

HURLEY, District Judge.

### INTRODUCTION

Based on the proof adduced at a bench trial before the undersigned, Airlines Reporting Corporation ("ARC") seeks to recover $202,877.64, plus interest and costs, from Inter Transit Travel, Inc. ("Inter Transit") and from Luis R. Fuksman ("Fuksman"), individually.

The gravamen of the complaint involves an agreement under which ARC furnished blank airline tickets to Inter Transit which, in turn, completed and sold the tickets to its customers. The resulting net proceeds were to be deposited in the corporate defendant's bank account for the benefit of plaintiff.

There is no question that the corporate defendant breached the agreement, *inter alia,* by not depositing $202,877.64 realized from ticket sales. The sole area of legitimate controversy is whether that delinquency is

also chargeable against Fuksman individually.

## TRIAL TESTIMONY

By way of a brief synopsis, the following testimony was presented to the Court:

### 1. *Testimony of Lloyd South*

Lloyd South, a manager of plaintiff ARC, testified that he administers the plan involved in the present litigation. Pursuant to the plan, plaintiff issues blank airline ticket stock of participating carriers to licensed travel agencies with which it has "Agent Reporting Agreement[s]." Using that stock, the agent sells airline tickets to its customers. The sales proceeds are then placed in a designated bank account of the agent who notifies plaintiff of the amount involved. Once a week plaintiff submits a draft against that account for that amount, minus commission and other minor charges.

The witness explained that the "Agent Reporting Agreement" and "Memorandum of Agreement" both dated September 26, 1989, constitute the contract between ARC and Inter Transit. (Pl.'s Ex. 1 and Ex. 2.) He also referred to a form received from Inter Transit entitled "Change of Agency Location." (Pl.'s Ex. 3.) That document indicated that as of February 4, 1991, the business would be moving from 68 Avenue A, New York, New York to 53–06 108th Street, Corona, New York.

Mr. South explained an ARC computer print-out reflecting the airline tickets sold by the corporate defendant through May 20, 1994 for which payment was never made to ARC. The amount involved was $222,877.64. From that sum, $20,000 was collected by plaintiff under a letter of credit which the corporate defendant provided at the time the agency agreement was signed, leaving a balance of $202,877.64.[1]

Under the contract, a change in ownership of Inter Transit of 30% or more had to be approved by plaintiff as a condition to continue participation in the program. Although such a change in ownership did occur, as will be detailed in reviewing Fuksman's testimony, South indicated that permission was never obtained, nor even sought for the transfer.

During cross-examination, South testified that sales proceeds need not be placed in a segregated bank account but could be commingled with other funds. However, the travel agent must provide the number for the bank account into which such sums will be deposited, so that the plaintiff may draw a weekly draft for the net sales reported for that period of time.

During the course of defense counsel's examination of South, the following defendants' exhibits were received into evidence:

a) letter dated August 21, 1991, from ARC to Inter Transit indicating that its records would henceforth list the new address in Corona (Defs.' Ex. A);

b) what appears to be an internal ARC memorandum dated October 5, 1991, which reflects that one of its employees purchased an airline ticket from Festival Travel at 57–03 Catalpa Avenue, Ridgewood, New York, which ticket was stamped with an airline validation plate which had been issued to Inter Transit (Defs.' Ex. B);

c) a handwritten note dated October 8, 1991, which again appears to be an internal document of ARC, reflecting that a "test buy" was made at an unauthorized location (presumably, Festival Travel) (Defs.' Ex. C);

d) a letter dated November 7, 1991, from ARC to Inter Transit indicating that this sale from an unauthorized agency represented a contractual breach which could result in a termination of the agreement. (Defs.' Ex. D). Inter Transit was directed to advise plaintiff "in writing within fifteen days of the date of this letter as to the corrective measures you have taken." *Id.*

In addition to the above items that were received into evidence, defense counsel showed South a document—later received into evidence during the testimony of Fuks-

---

1. In paragraph 9 of the complaint, plaintiff sought $196,572.21 for the period from December 1990 through January 1992. The difference between that sum and $202,877.64 is attributable to reports from carriers, received after the action was commenced, of additional tickets sold by Inter Transit that were never paid for by the agency.

man as Defs.' Ex. G—which indicates that a 30% interest in the corporation had been transferred to Antonio Willims. That document, dated February 7, 1991, was signed by defendant Fuksman as corporate secretary. Mr. South said that he had never seen that document before and if it had been presented to ARC, there would have been a corresponding approval or disapproval form in his file, which there was not.

On redirect examination, South testified that a review of the records indicates that first class tickets were issued to Fuksman and a companion for a round trip from New York City to Rio de Janeiro, at a cost of $10,500. Those tickets are included in $202,877.64 previously mentioned. Two additional airline tickets with a face value of $1,744 were also issued to Fuksman, which sum again never made its way to plaintiff's coffers.

In November and December of 1991, Willims, as a new shareholder of Inter Transit, also booked several trips for himself without reporting the tickets to ARC.

The relationship between ARC and Inter Transit was terminated by plaintiff in February of 1992.

### 2. Testimony of Luis R. Fuksman as Part of Plaintiff's Case

Mr. Fuksman was plaintiff's second, and final witness. He testified that Inter Transit was incorporated in 1988. The corporation's relationship with plaintiff was established in 1989. At that time, Fuksman owned 50% of the stock and Fernando Vizioli owned the remaining 50%. Sometime thereafter, Vizioli left and Fuksman became the sole owner of the corporation.

Fuksman indicated that he understood the reporting requirements of the agency argument, but that Vizioli handled all the related paper work. He was aware that ARC would issue weekly drafts against the bank account designated by Inter Transit for the amount of the ticket sales reported.

After the agency changed its location to Corona, Queens in February of 1991, he lessened his contact with the agency from providing some type of supervision on a daily basis to visiting the facility "periodically."

### 3. Testimony of Luis R. Fuksman, as Part of Defendants' Case

One witness was called by the defendants, viz. Luis R. Fuksman. He again indicated that he started the agency in 1988 with an associate by the name Fernando Vizioli. It was explained that Fuksman's primary occupation was the retail sale of liquors, and that Vizioli alone had expertise in the travel business. As a result, Fuksman provided the funds to start Inter Transit, with Vizioli donating his experience to the venture. Each was a 50% shareholder.

Mr. Vizioli left the operation in February of 1990. Thereafter, Fuksman "very rarely" prepared the necessary reports to ARC, preferring to rely upon Mr. Gonzalez, whom he had hired a month before Vizioli's departure, to perform that, and other tasks, at the travel agency.

By agreement dated November 29, 1990, Messrs. Willims, Hernandez and Rosales agreed to purchase the agency from Fuksman for $35,000. That sum was paid by $15,000 in cash, with a series of promissory notes being executed for the balance. Thirty percent of the stock was transferred to the purchasers simultaneously with the cash payment, with the remaining seventy percent to be delivered upon satisfaction of the final note. The agreement, as mentioned previously, was received into evidence as Defs.' Ex. G.

Mr. Fuksman testified that the over $12,000 in unpaid airline tickets that he received from the agency were issued to him with the understanding that the new owners would deduct the amount of those tickets from the sum due to him under the agreement of sale.

Following execution of the November 29th agreement, Fuksman was no longer a signatory on any agency bank accounts, and he testified he received none of the misappropriated funds which are the subject of this lawsuit.

With respect to the ARC form reflecting the corporate stock transfer, Fuksman said he was involved in its preparation and execu-

**86**

tion but understood it was mailed to plaintiff by Willims. It will be recalled that ARC never received the document. It should be noted that the notification form, assuming it was sent, was inaccurate for it failed to list Hernandez and Rosales as stock purchasers.

Mr. Fuksman indicated that from November 29, 1990 until the present action was commenced, he assumed that Willims, Hernandez and Rosales were complying with the agency's obligations under its agreement with ARC. Mr. Fuksman further testified that he did not know of a subsequent move by the agency from Corona to Roosevelt until after the fact, at which time he was assured by Willims that the move had been authorized.

### DISCUSSION

■ Plaintiff's complaint contains causes of action sounding in breach of contract, breach of fiduciary duty, conversion, common law fraud, and negligence.

Defendant Fuksman argues that the proof at trial fails to establish any basis for him to be held personally responsible for the $202,-877.64 loss sustained by plaintiff. The Court, however, rejects that view, and finds that ARC has established, by a preponderance of the credible evidence, that it is entitled to judgment against both defendants under its conversion cause of action.

Initially, it should be noted that the entire loss in question occurred after Fuksman agreed on November 29, 1990 to transfer his then one hundred percent stock interest in Inter Transit to Willims, Hernandez and Rosales. Once those individuals entered the picture, over $200,000 disappeared. The record is devoid of any evidence suggesting what use was made of the absent funds, and by whom except to the extent, as noted previously, that $12,244 in unreported tickets were traced to trips taken by Fuksman, with a lesser sum being attributable to trips made by Willims.

■ Conversion entails the unauthorized exercise of control over the personal property of another. *See generally* 23 *N.Y.Jur.2d,* Conversion §§ 22 and 34 ("A delivery of property, by one to whom it has been en-

trusted by the owner, to ... one not entitled to its possession may constitute a conversion for which an action will lie.")

Plaintiff argues that the missing airline ticket proceeds are "trust assets" (*i.e.* ARC's property), which both Inter Transit and Fuksman have converted. That argument is predicated primarily on the language of ARC's contract with Inter Transit, which provides, *inter alia,* that the ticket sales proceeds are "the property of the carrier and shall be held in trust until accounted for to the carrier." Pl.'s Ex. 1, Section VII(B); *see also id.* at Section VIII(A)(5). Although this contractual language is certainly germane to the issue under consideration, it is not dispositive. The Court has an obligation to go beyond the terminology used in an effort to determine the substance of the relationship between the parties. As part of that process, the Court may consider whether the funds are required to be placed in a separate account, free of commingling with other monies. As mentioned previously, a perusal of the agreement in this case discloses no such restriction. Indeed, there is nothing in the agreement which would prevent the corporate defendant from utilizing ticket sales receipts in the designated bank account for its own purposes, as long as sufficient funds are on deposit at the end of the reporting period to cover the drafts made by ARC.

Therefore, the use of the word "trust," and the related language in the agreement upon which the plaintiff relies, is counterbalanced by the absence of a provision requiring the segregation of the claimed trust property.

Moreover, reference to case law seems to indicate that permissive commingling of funds is fatal to plaintiff's position. *See, e.g., In re Shulman Transport Enterprises Inc.,* 744 F.2d 293 (2d Cir.1984); *In re Morales Travel Agency,* 667 F.2d 1069 (1st Cir.1981); *In re Einhorn,* 59 B.R. 179 (E.D.N.Y.1986); and *In re Black & Geddes,* 35 B.R. 830 (S.D.N.Y.1984). The following excerpt from *In re Morales Travel Agency* is particularly germane:

[T]he terms of the IATA Agreement and Resolutions were inadequate, in our view to give rise to a trust upon the proceeds from tickets sold by Morales to its custom-

ers. To be sure, Resolution 820(a) recited, in general terms, that the agent was to hold whatever moneys in trust for the carrier until accounted for and these moneys were the carrier's property until settlement occurred. However, talismanic language could not throw a protective mantel over these receipts in the absence of a genuine trust mechanism. Here, the relationship remained in practical fact that of debtor creditor. The contract no where requires Morales to keep the proceeds of Eastern ticket sales separate from any other funds, whether Morales's own funds or the proceeds of other ticket sales.

Yet there is some authority to the contrary which arguably tends to support plaintiff's position. See *Air Traffic Conferences v. Downtown Travel Center, Inc.*, 87 Misc.2d 151, 383 N.Y.S.2d 805, 806 (Sup.Ct. N.Y. County 1976) (please note, however, that the agreement in *Downtown*, unlike the case at bar, required the agent to deposit the monies "in a special account in the name of the agent in trust for ATC" [which, parenthetically, was not done]).

In conclusion of this point, the ticket sales proceeds could only be subject to conversion if they are deemed to be the assets of ARC under a theory of trust. Although the question is subject to debate, the weight of authority suggests the relationship between ARC and Inter Transit in this regard may not be so categorized.

However, no such dispute exists as to the blank ticket stock, *i.e.* the *other* item of property that plaintiff maintains was a subject of conversion by defendants.[2] Indeed the ticket stock, as well as the concomitant airline validation plates, were stipulated by the parties to be "the property of Airline Reporting Corporation and not the property of Inter Transit Travel." See Stipulation 8 of the "Stipulation of Facts" portion of Joint Pretrial Order. As such, they may, depending on the circumstances, be subject to a trust in favor of ARC.

By way of background, the agreement provides that Inter Transit may not continue to participate in the program should its ownership change by 30% or more, absent approval of the new stockholders by ARC. (See Pl.'s Ex. 1, §§ VIII(I) and XIX.) In this way, plaintiff sought to protect its property (*viz.*, its blank ticket stock and airline validation plates) from being utilized by individuals or entities to whom it occupies the status of stranger. Yet, Fuksman, as the then sole shareholder of Inter Transit, agreed on November 29, 1990 to sell all his shares to Willims, Hernandez and Rosales. From that day forward, according to Fuksman, those three individuals alone managed the corporation and controlled all of its activities, including the sale of airline tickets. Such sales involved the use of the ticket stock and validation plates which Fuksman made available to Willims, Hernandez and Rosales.

■ It is axiomatic that an officer or director is not personally responsible to a third party for a corporate act of conversion unless that individual was personally involved in the wrongdoing. See generally 15 *N.Y.Jur.2d*, Business Relationships, § 1085, pp. 357–58.

Plaintiff failed to prove that the $202,877.64 represented trust assets and/or that Fuksman was personally involved in misappropriating those funds, either alone or in conjunction with others. But that fact does not preclude him from being called upon to personally answer for Inter Transit's delinquency, for his activities set the stage for the misappropriation. He, not the corporation, sold his stock and, in the process, placed the instruments of loss, *viz.* ARC's blank ticket stock and airline validation plates, in unauthorized hands. He, as the sole shareholder of Inter Transit, undertook the task of notifying ARC of the change in ownership which—if he is to be believed—he endeavored to do two months after the fact and, even then, erroneously so, by only listing one of the three new shareholders. Moreover, as the trier-of-fact, the Court finds that the change of ownership form, for whatever reason, nev-

---

**2.** See, e.g., ¶ 18 of Pl.'s Compl. ("... the defendants ... employed the aforementioned airline tickets and the monies generated from them for their own use and purposes") and ¶ 20 ("... defendants conversion of the aforementioned airline tickets and monies ... were undertaken for the express intention of depriving ... the plaintiff out of its rightful property and money.")

er reached ARC. In any event, it is undisputed that ARC's approval was never obtained as required by the agreement.

Granted, this latter delinquency regarding notice constitutes a breach of contract. Nevertheless, it is relevant to the conversion claim because it prevented ARC from discovering that its property was being utilized by Willims, Hernandez and Rosales, and eviscerated its contractual right to pass upon the suitability of those three individuals to participate in its ticket sales program. Therefore, the conversion, as well as the breach of contract which is intertwined with that conversion, are each a proximate cause of plaintiff's loss, and Fuksman was individually involved in both. Accordingly, he, along with the corporation is liable to plaintiff for the resulting loss. The question then becomes in what amount.

Generally, "the proper measure of damages in an action for conversion is the value of the property, that is, the amount required to replace the goods at the time and place of the ... conversion by the wrongdoer, unless special circumstances require the adoption of a different measure of damages...." 23 *N.Y.Jur.2d*, Conversion, § 66. Such "special circumstances" are present here for the dimensions of the loss occasioned by the conversion of ARC's blank ticket stock and airline validation plates was readily foreseeable. *See generally id.*, § 73. Indeed, the items themselves are essentially devoid of intrinsic worth. Their value—as Fuksman's trial testimony indicates he well understood—is derived from their ability to generate substantial amount of revenue via airline ticket sales. Under the circumstances, the $202,877.64 loss was a natural and proximate consequence of defendants' conversion of ARC's property.

### CONCLUSION

Plaintiff having prevailed on its conversion claim, its other causes of action seeking the same relief will not be addressed. Moreover, plaintiff's claim for punitive damages is denied because there is unsufficient evidence as to the attendant circumstances of defendants' conduct to support such an award.

For the reasons above stated, plaintiff is entitled to judgment against Inter Transit Travel, Inc. and against Luis R. Fuksman for $202,877.64, with interest and costs.

SO ORDERED.