**In re Lewis Charles BISHOP, Jr., Debtor.**

**Airlines Reporting Corporation, Plaintiff,**

**v.**

**Lewis Charles Bishop, Jr., Defendant.**

**Bankruptcy No. 7–00–00479. Adversary No. 7–00–00137.**

United States Bankruptcy Court, W.D. Virginia, Roanoke Division.

March 6, 2001.

Harry Wayne Brown, Roanoke, VA, for Debtor.

Thomas W. Repczynski, Bean, Kinney & Korman, P.C., Arlington, VA, for Airlines Reporting Corporation.

## MEMORANDUM OPINION

WILLIAM F. STONE, Jr., Bankruptcy Judge.

### Introduction and Findings of Fact

This adversary proceeding brings before the Court an example of a business overwhelmed by the consequences from one misguided decision. That decision made by Mr. Bishop, the Debtor, on behalf of the incorporated travel agency (Roanoke Travel & Cruise Services, Inc., d/b/a Travel Network, Inc.) of which he was the president and principal owner, was to allow access by a person, John Roth, and his business, Travel Occaquan, of whom and which he apparently knew little, to Bishop's agency's ability to issue airline travel tickets, in effect almost a license to print money. That valuable ability was derived from the travel agency's accredited status as an authorized issuer of tickets on behalf of the commercial airline owners of Air-

lines Reporting Corporation ("ARC"), the plaintiff in this proceeding, which serves as a national clearinghouse to supply stocks of blank tickets to travel agents for sale to their customers.

As might be expected for such a business arrangement so fraught with the potential for financial mischief, the agreement between ARC and its authorized travel agents is lengthy, detailed and highly restrictive. Even to become an accredited travel agency requires that detailed information be provided satisfactory to ARC of the owners, officers and employees of the agency and the full-time employment at the agency's designated location of an individual who "has had at least two years of FULL–TIME experience selling general travel services to the public or supervising the operation of a business offering such services" and "who has had at least one year of FULL–TIME experience in airline passenger ticketing within the past three years." (Pages 6–7 of Agreement And Application For Approval By ARC And Inclusion On The ARC Agency List). Any change of ownership control of the agency must likewise be reported to and approved by ARC to permit the agency to continue its privileged status. Even after the arrangement has become effective, ARC periodically requires the agent to execute a new "Memorandum of Agreement to the Airlines Reporting Corporation Agent Reporting Agreement" documenting the parties' continuing agreement to the contractual provisions governing their arrangement. As relevant to this proceeding, Mr. Bishop on November 17, 1997 signed as president of the agency a new Memorandum of Agreement having an effective date of February 2, 1998.

The Agent Reporting Agreement places a number of restrictions on the agency's freedom of action concerning the handling and issuance of the ticket stock placed in the agency's possession and under its control. Most particularly relevant to the decision of this proceeding are the following provisions of such Agreement:

All ARC traffic documents (including ARC-issued numbers used in an electronic format) supplied to the Agent shall be held in trust for ARC by the Agent until issued to the Agent's clients to cover transportation or ancillary services purchased, or until otherwise satisfactorily accounted for to ARC or the carrier, and shall be surrendered upon demand, together with all airline identification plates, to ARC pursuant to this agreement.

Section XI, paragraph D.

The Agent shall designate a bank account for the benefit of ARC and the carrier for deposit of (1) the proceeds of the sales of air transportation and ancillary services for which ARC traffic documents were issued, and (2) such funds as may be required to pay any other amount which ARC is authorized to draft from the account. The Agent recognizes that the proceeds of the sales, less the Agent's commission, on these ARC traffic documents are the property of the carrier and shall be held in trust until accounted for to the carrier.

Section VII, paragraph B.

The Agent may exercise the authority granted herein, only at such places of business operated by the Agent as are included on the ARC agency list.

No branch location shall be included on the agency list unless the corporate structure or ownership of the home office and the branch is absolute and all inclusive as a single entity, and the home office has full legal and financial responsibility for the administration, staff, liability, maintenance, and operational expense of the branch location.

If the Agent wishes to have a place of business included on the agency list as a branch location under the terms of this agreement, it shall submit an application to ARC in accordance with the procedures ARC shall prescribe for submitting and processing such applications. ARC shall not approve any application for a branch location unless, among other things, the Agent is properly bonded on the amount and form required by section IV.A.1 of this agreement.

Section III, paragraphs A, C and D.

ARC traffic documents (including ARC-issued numbers used in electronic format) supplied for issuance at a specified place of business covered by this agreement shall not be written up or validated at any other place of business. ARC traffic documents (paper format) shall not be delivered to customers at or through any other agency location outside the United States, or customer-premises location.

Section XII, paragraph E.

The Agent shall comply with all instructions consistent with this agreement properly issued to him by ARC in the Industry Agents' Handbook and other specific instructions consistent with this agreement provided from time to time by ARC, including, but not limited to, those instructions which the Agent must follow regarding the electronic submission of its weekly sales reports . . .

Section VII, paragraph G. The Industry Agents' Handbook provides in section 14.0 in relevant part as follows:

An agent is required, pursuant to section VIII of the agreement, to remit on a weekly basis for the sales made on behalf of its principals. This remitting obligation is not excused by the agent's inability or failure to collect its accounts receivable. Consequently, every agent must tailor its credit policies in such a way that they will not interfere with the agent's duty to make full and prompt remittance.

In the face of these obligations on January 31, 1998 Mr. Bishop on behalf of his agency entered into a Letter Of Understanding with Travel Network, Occaquan which in the very first sentence set forth the reason for their arrangement:

Travel Network, Occaquan wishes to use the ARC Number and ticket printing capabilities of Travel Network, Roanoke on a month to month basis.

The parties agreed that the commission applicable to tickets sold by Occaquan through Roanoke would be divided 70% to Occaquan and 30% to Roanoke. Occaquan (Roth) promised "to deposit daily into Crestar Bank all funds owed for all tickets that were ticketed through Travel Network, Roanoke" and that "unless prior arrangements have been mutually agreed to, all tickets not paid for prior to noon each Tuesday will be canceled." The parties further agreed that each would continue to operate "independently and their legal entities will remain intact and exclusive" and that neither would do business with the other's clients without the written approval of the other party. They agreed to settle up with each other weekly and that Occaquan would be "responsible for any D/M's (debit memos) issued by ARC or the Airlines created for their tickets . . . [within] 21 days from receipt of copy of D/M to clear it up or make payment to Travel Network, Roanoke." The sad end of the story is that as a result of the criminal manipulations of Roth, principally by means of improper and fraudulent use of his own credit card and one in the name of a third party, many thousands of dollars worth of airline tickets were issued for which neither ARC nor the Roanoke agency was paid. When called upon to account

in this proceeding by ARC, which seeks a ruling that not only should Mr. Bishop be held personally liable for the resulting losses, but also that such liability should be excepted from any discharge granted to him in this case, the Debtor says that he entered into the agreement on behalf of the agency in good faith "upon the advice of, and at the behest of Jerry Waite, the regional Vice President of the Travel Network franchise, and as Jerry had done in other parts of the state". He further points out that he personally was not a party to either the ARC agreement or the Occaquan agreement, that all of his actions were performed in his capacity as the president of the incorporated travel agency and therefore he has no personal liability for what occurred, no matter how unfortunately those consequences may have turned out.

ARC's Complaint initiating this Adversary Proceeding sets forth four counts seeking relief against Bishop:

I. To award a judgment against Bishop for $300,000 and except it from discharge under 11 U.S.C. § 523(a)(2)(A) for travel tickets obtained by "false pretenses, a false representation, or actual fraud".

II. To award a judgment against Bishop for $300,000 and except it from discharge on the basis that he made initial false statements in the application to ARC and failed to comply with requirements to update or correct prior information which it is claimed bars the debt from discharge under 11 U.S.C. § 523(a)(2)(B) for property or services obtained by a materially false statement in writing respecting the debtor's or an insider's financial condition upon which the creditor reasonably relied and was made or published with intent to deceive.

III. To award a judgment against Bishop for $300,000 and except it from discharge under 11 U.S.C. § 523(a)(4) for "fraud or defalcation while acting in a fiduciary capacity".

IV. To bar Bishop from any discharge for certain alleged material misrepresentations and/or omissions in his bankruptcy petition and schedules.

ARC has filed a Motion For Partial Summary Judgment under Counts I (fraud) and III (defalcation by fiduciary). This Motion relies upon various admissions and statements made by Bishop during discovery, the provisions of the relevant documents noted above, and an affidavit from Mr. Donald C. Miller, ARC's Senior Manager, Claims and Arbitration. Among other subjects covered by that affidavit is that of damages. Mr. Miller states the total discrepancies from "false weekly reports that both failed to report all of the sales as required by the ARA [Agent Reporting Agreement] and improperly reported credit card transactions which were unauthorized" are at least $319,404.42; that Bishop "and Roanoke Travel ... failed ... to make sufficient funds available ... for the sales properly reported to ARC, resulting in a total of Dishonored Drafts in the amount of $7,827.52"; and that after taking into account all payments and credits (apparently representing the proceeds of a fidelity bond in favor of ARC), the total damages suffered by ARC for nonpayment of Roanoke Travel's ARC traffic documents are not less than $306,019.26. Bishop has likewise filed an affidavit denying, among other things, "owing ARC any amount of money other than as a guarantor." Interestingly, no evidence has been offered to date that Bishop signed any personal guaranty of the obligations of his travel agency to ARC.

## CONCLUSIONS OF LAW

This Court has jurisdiction of this Adversary Proceeding pursuant to 28 U.S.C. § 1334 and the referral of bankruptcy cases by the District Court to this Court pursuant to 28 U.S.C. § 157(a). Proceedings to determine the dischargeability of particular debt and objections to discharge are defined as "core" bankruptcy proceedings by 11 U.S.C. § 157(b)(2)(I) and (J). It is appropriate to grant Summary Judgment in favor of one of the parties prior to trial if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Bankr.Proc. 7056(c).

 It is clear that the Agent Reporting Agreement between ARC and its accredited travel agents creates fiduciary obligations on the part of those agents in favor of ARC and its member carriers.[1] The agents expressly agree to hold ARC property and blank ticket stock "in trust" to handle and issue airline travel tickets strictly in accordance with the provisions of the Agent Reporting Agreement. Considering the ability to create large obligations on the part of the carriers which accredited travel agent status conferred, such fiduciary obligations are entirely reasonable and in accord with the duties of loyalty, honesty, compliance with instructions, due care and good faith which the law generally imposes upon agents in favor of their principals.[2] The Agreement expressly provides that it is to be controlled by Virginia law.[3] Even though Mr. Bishop may not have fully understood or indeed even read all of the provisions of the agreement to which he consented, it is well established under Virginia law that one who signs a written agreement is bound by all of its terms in the absence of some showing of fraud, duress, illegality, incapacity or mutual mistake, none of which is applicable to the facts of this matter.[4] Although various provisions of the Agent Reporting Agreement are pertinent to the history of the Roanoke Travel/Occaquan Travel business relationship, it suffices for the purpose of this opinion to refer to that paragraph in which the agent agrees to hold all "ARC traffic documents ... in trust ... until issued *to the Agent's clients* to cover transportation and ancillary services purchased, or until otherwise satisfactorily accounted for ..." Section XII, paragraph D. The very basis of the relationship created between Roanoke and Occaquan by their Letter Of Understanding constituted a blatant violation of the terms of Roanoke's agreement with ARC and contemplated actions, namely, the issuance of tickets by Roanoke to Occaquan's customers, which would be clear breaches of trust as to ARC and its owner air carriers. The Court concludes that each issuance of a ticket by Roanoke to an Occaquan customer constituted a breach of trust under the Agent Reporting Agreement and that Roanoke is liable for all losses resulting to ARC thereby. The Court further concludes that the corporate characteristic of limited liability, the general purpose of which is to protect corporate shareholders

---

1. *Airlines Reporting Corporation v. Inter Transit Travel, Inc.,* 884 F.Supp. 83 (E.D.N.Y. 1995); ‘*In re Folliard,* 10 B.R. 875 (D.Md. 1981); *Airlines Reporting Corporation v. Ellison,* 265 B.R. 539 (Bankr.S.D.W.Va.1999).

2. *H–B Ltd. Partnership v. Wimmer,* 220 Va. 176, 179, 257 S.E.2d 770, 773 (1979); 1A Michie's Jurisprudence 713–724, Agency §§ 55—67 (1993).

3. Section XXXI of Agent Reporting Agreement.

4. *Ayers v. Mosby,* 256 Va. 228, 504 S.E.2d 845, 848 (1998); *First Nat. Exch. Bank of Va. v. Johnson,* 233 Va. 254, 355 S.E.2d 326, 329–30 (1987); *In re Simmons,* 27 B.R. 508, 509 (Bankr.W.D.Va.1983).

uninvolved with the conduct of their corporation's business from the liabilities incident to such business, does not shield Mr. Bishop from personal liability to ARC because he was personally involved in and authorized the agreement with Occaquan, the very essence of which was a breach of the obligations which his agency had assumed to ARC. In such situations it is well established that a corporate official who personally participates in a breach of trust by the corporation is personally responsible for the consequences of his own conduct.[5] Having signed both his agency agreement with ARC and the Letter of Understanding with Occaquan (Roth), Bishop is charged with knowing the provisions of both agreements and the fact that the Letter Of Understanding with Occaquan violated the terms of the ARC agreement. Because of Bishop's personal and controlling involvement both with the creation of the trust in favor of ARC and the breach of trust occasioned by the agreement with Occaquan (Roth), the Court has no difficulty in concluding that Bishop's personal liability to ARC should be excepted from discharge as liability for "defalcation while acting in a fiduciary capacity."

The damages sought by ARC from Bishop, however, are not limited purely to those resulting from the tickets improperly issued to Occaquan's customers by Roanoke but rather to all losses resulting from the agency's failure to pay for all tickets issued under its authority. While it appears that most if not nearly all of the losses resulted from the tickets improvidently issued to Occaquan's customers, it is not clear that this total is at least $300,000. While the agency itself is no doubt liable for all failures to pay ARC,

some of the discrepancies may have resulted from events for which Bishop personally is not responsible. Without being able to parse Mr. Miller's affidavit to determine how much of ARC's loss resulted from the Occaquan debacle and how much from other causes, the Court is unable to say at this point that ARC is entitled to a $300,000 judgment against Mr. Bishop.

The Court further declines to follow ARC's suggestion that Mr. Bishop should be denied a discharge on the ground that the criminal conduct of Roth is imputable to Bishop personally and bars his discharge on the ground of "fraud" just as it would bar Roth's own discharge. While the Court recognizes that a debt incurred by fraud can be excepted from a discharge granted to one who is liable for but did not personally participate in, or was even aware of, the criminal actions of another, see *Deodati v. M.M. Winkler & Assocs. (In re M.M. Winkler & Assocs.)*, 239 F.3d 746 (5th Cir.2001) (innocent partners held to have non-dischargeable liability for fraud of other partner), the Court does not believe that the facts are sufficiently developed at this point to conclude that ARC is entitled to Summary Judgment on this count of its Complaint. ARC also contends that the falseness of any incorrect reports made to it by the agency and all of its failures to pay for the ticket stock which it held in trust for ARC during the time in question furnish a basis to except the agency's debt from Bishop's personal discharge on this same ground of fraud. For similar reasons relating to the lack of clarity as to the personal legal liability of Bishop for these events, the

---

5. *American Honda Finance Corp. v. Calvin*, Civ. Action # 92.0085–B, 1993 WL 208236, 1993 U.S. Dist. LEXIS 442 (W.D.Va.1993); *Airlines Reporting Corporation v. Specialty Travel, Inc.*, Civ. Action # 00–474–A

(E.D.Va.5/12/2000); *Gibson v. BoPar Dock Co. Corp.*, 780 F.Supp. 371, 374 (W.D.Va.1991); 4B Michie's Jurisprudence 315–16, Corporations § 191 (1999).

Court believes that Summary Judgment on this Count to ARC is unwarranted.

 Before concluding the Court believes that it should deal with certain other issues or possible defenses raised by Mr. Bishop in his Objection and supporting Affidavit. While Bishop contends that "no" money is owed by his agency to ARC, the Court concludes that the general nature of this denial is insufficient to respond to the specific allegations of ARC's Motion and supporting materials. Mr. Bishop further contends that any liability of the agency to ARC was discharged in the agency's own Chapter 7 bankruptcy. This assertion fails to recognize that a corporation does not obtain a discharge in a Chapter 7 bankruptcy proceeding. 11 U.S.C. § 727(a)(1). Mr. Bishop further contends that "ARC brought an action against me before the arbitration panel to account for the items given to me; that after accounting as requested by the arbiters, the action was dismissed with prejudice." When the Court inquired of Bishop's counsel during the hearing on ARC's Motion for Partial Summary Judgment what this particular issue was about, the Court understood from his response that the arbitration proceeding related to accounting for ARC's tangible property and unissued ticket stock which ARC believed still to be in Bishop's possession or under his control, not an accounting for the cost of tickets which ARC knew had been issued but not paid for. In the event the Court misconstrued counsel's response on this point, Bishop is free to file a timely motion for rehearing containing a detailed and specific explanation for this asserted ground for non-liability. As to Mr. Bishop's assertion that he agreed to the arrangement with Occaquan based on the advice of one Jerry Waite, the regional vice president of the Travel Network franchise, a fiduciary's breach of trust is not excused because a third person suggested that he do so, particularly when the agreed upon arrangement on its face created a business relationship the execution of which would necessarily require the fiduciary to breach his trust. The Court believes that the other points raised by Mr. Bishop have been adequately addressed in the earlier portions of this opinion.

The Clerk is directed to send copies of this opinion to the persons specified in an Order being entered contemporaneously herewith in this Adversary Proceeding.