**In re Elena VINOGRADOVA, Debtor.**

**Airlines Reporting Corp., Plaintiff,**

**v.**

**Elena Vinogradova, Defendant.**

**Bankruptcy No. 01 B 20085(ASH).
Adversary No. 01–5313A.**

United States Bankruptcy Court,
S.D. New York.

Nov. 16, 2001.

Arthur Morrison, Hawthorne, NY, for Debtor–Defendant.

Wilson, Elser, Moskowitz, Edelman & Dicker LLP, By Joan H. Langer, Newark, NJ, for Plaintiff.

LeClair Ryan, P.C., By Christie Lyman Dowling, Alexandria, VA, Trial Counsel for Plaintiff.

### DECISION AFTER TRIAL

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

Plaintiff Airlines Reporting Corp. ("ARC") brought this adversary proceeding against debtor-defendant Elena Vinogradova ("Vinogradova") seeking a judgment (1) establishing that Vinogradova is liable to ARC in respect of a monetary loss suffered by ARC in the amount of $197,281.02 and (2) declaring that such liability is non-dischargeable under 11 U.S.C. § 523(a)(2), (4) and (6). For the reasons stated herein, I conclude (1) that ARC has not established any factual or legal basis for liability on the part of Vinogradova and, even if there were grounds for liability, (2) that such debt could not be held non-dischargeable under Section 523(a)(2), (4) or (6).

### *Jurisdiction*

This Court has subject matter jurisdiction over this controversy under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of Reference signed by Acting Chief Judge Robert J. Ward dated July 10, 1984. This is a core proceeding under 28 U.S.C. § 157(b).

### *Findings and Conclusions*

The adversary proceeding was tried to the Court without a jury on October 30 and 31, 2001. The following constitute the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052.

### *Background Facts*

#### *ARC and the ARA*

ARC is a corporation whose stockholders are the principal scheduled airlines of the United States. ARC serves as the national clearinghouse for issuing blank ticket stock and other forms of traffic documents to travel agents to be issued as air passenger tickets by travel agents to their customers.

ARC maintains an agency list of persons and entities qualified to serve as travel agents and to issue ARC traffic documents. ARC issues to each approved travel agency an ARC agency code number and an ARC nameplate for use in issuing tickets. ARC enters into an Agent Reporting Agreement ("ARA") with all approved travel agencies. The standard form ARA contains certain provisions that ARC-approved travel agencies are required to comply with, including where and

what type of bank account the proceeds from the travel agency are to be deposited into and the requirements as to the approval for any change of name, location or ownership. The ARA also governs the issuance of ARC traffic documents to the agents, how the agents may issue the traffic documents to their customers, and how the agent must account therefor.

The ARA requires the travel agency to hold ARC traffic documents in trust, to submit weekly sales reports of all ARC traffic documents and to establish a special bank account (the "special bank account"). The agent is required to deposit in the special bank account the proceeds of all sales for which ARC traffic documents were issued. The ARA provides that all such sales proceeds deposited in the special bank account are held in trust for ARC. ARC itself is entitled to withdraw funds from the special bank account for payment to the airlines entitled to receive payment in respect of the traffic documents issued by the agent to their customers; the balance remaining in the special bank account constitutes the agent's commissions for such sales.

### Vinogradova and Selene Travel Corp.

Vinogradova is a Russian immigrant to the United States. It was stipulated that she formed a travel agency in March 1995 known as Selene Travel Corp. (Actually, it appears from the documents that Selene Travel Corp. was formed by Ms. Vinogradova at some time prior to March 1995, but the discrepancy is not material to this decision.) In March 1995 Vinogradova doing business as Selene Travel Corp. applied for certification and inclusion on the official ARC Agency List. Her application listed herself as president, sole officer and sole shareholder of Selene Travel Corp., having an address at 50 West 34 Street, New York City.

ARC sent a form letter dated December 7, 1995 addressed to "SELENE TRAVEL CORP ... ATTENTION: OWNER OR MANAGER" in which ARC stated that "your agency" has been included in the ARC Agency List effective that same day. The letter notified Selene Travel Corp. that "[y]our ARC agency code number is: 33–63630–4." Enclosed with the December 7 letter was a "MEMORANDUM OF AGREEMENT TO THE AIRLINES REPORTING CORPORATION AGENT REPORTING AGREEMENT" listing Selene Travel Corp. as the "NAME OF AGENT" signed by "Elena Vinogradov" as President. An ARC nameplate was issued in the name of Selene Travel Corp.

After her ARC accreditation in December 1995, Vinogradova operated Selene Travel Corp. for approximately fifteen months. She actively managed the business herself as President of Selene Travel Corp., assisted by several employees. Vinogradova opened a special bank account in the name of Selene Travel Corp., received an initial supply of traffic documents from ARC, periodically ordered new supplies of travel documents as needed, reported all sales on weekly sales reports, and deposited all proceeds in the Selene Travel Corp. special bank account, from which ARC withdrew the funds necessary to pay the airlines entitled to be paid, all in accordance with the ARA. In late January 1996 Vinogradova submitted to ARC a "CHANGE OF AGENCY LOCATION" form reflecting that Selene Travel Corp. moved its business from 50 West 34 Street to 507 Fifth Avenue, a favorable location at the corner of 42nd Street. No claim has been made by ARC, and no evidence has been submitted, that Vinogradova committed any breach of her obligation to ARC in respect of the weekly sales reports, deposit of sales proceeds in her agency's special bank account or otherwise during the period that Vinogradova operated Selene Trav-

el Corp. from December 1995 through March 1997.

### *Vladimirskiy and Internet Global Travel*

By late 1996 or early 1997 Vinogradova was engaged in a divorce proceeding with her then-husband, who had taken their child to Russia. With the difficulties in her personal life, she could no longer continue to operate Selene Travel Corp.

Vinogradova had become acquainted with one Igor Vladimirskiy, who operated a travel agency in the name of Internet Global Travel which, apparently, was not accredited by ARC. Vladimirskiy offered to purchase Selene Travel Corp. from Vinogradova, and she agreed to sell her business to him for $10,000. The transaction was not documented by any written agreement or memorandum. According to Vinogradova's testimony, the sale transaction took place in March 1997, although Vladimirskiy's installment payments on the $10,000 were not completed until sometime (the record is not clear) after March 1997.

In connection with the sale to Vladimirskiy, Vinogradova testified that she obtained the change-of-ownership form from ARC, completed her portion of the form, and delivered the form to Vladimirskiy for him to complete his application and send the form and application on to ARC. The trial witness for ARC, Stephen Anthony Dagirmanjian, testified that there is no record in ARC's file of having received a change-of-ownership form for or in relation to Selene Travel Corp., Internet Global Travel, Vinogradova or Vladimirskiy. However, two relevant documents introduced at trial were forwarded to and received by ARC.

The first document was an ARC "CHANGE OF AGENCY NAME" form dated March 21, 1997 and signed by one Ivan P. Kovalev, purportedly an "owner or officer." (In fact, Kovalev was Vinogradova's boyfriend, subsequently to become her husband, and he was not employed by either Selene Travel Corp. or Internet Global Travel.) The form indicates "Present legal name of Agency: Selene Travel Corp." and gives the "Agency Code Number" as 33 63630–4, with the Selene Travel Corp. address at 507 Fifth Avenue. In item 3 the form reports that "Internet Global Travel" is the agency's "NEW D/B/A" effective March 21, 1997. In response to the question in item 5 on the form "Is this name change part of a proposed ownership change?", the "NO" box is checked. Immediately beneath item 5 the form states: "If YES, submit proper ownership change forms...." and, as noted above, there is no evidence that any ownership change forms were filed either by Vinogradova or by Vladimirskiy.[1]

The second relevant document is a June 2, 1997 letter addressed to ARC on the purported letterhead of "Selene Travel" stating as follows:

> Please be advised that Mr. Igor Vladimirskiy is currently employed by Selene Travel at the position of Executive Officer and has an authorize [sic] signature right for the banking and finansial [sic] matters.

> If any questions should arise please do not hesitate to contact me at the following number:

> (212) 681–8182 or (212) 297–1818

The letter was purportedly signed over the typewritten name and title Elena Vinogradova, President. Vinogradova testified unequivocally that the letter was not signed or written by her and that she had no

---

1. It is surprising, if not extraordinary, that neither Vinogradova nor ARC called Vladimirskiy as a witness, offered Vladimirskiy's deposition transcript or, apparently, even took Vladimirskiy's deposition.

knowledge of the letter until it was shown to her during her deposition. The purported signature of Elena Vinogradova bears no resemblance to Vinogradova's acknowledged signatures on other documents in evidence. I accept Vinogradova's testimony as truthful and find as a fact that she did not write or sign the June 2, 1997 letter and did not know of its existence at the time it was sent. Nevertheless, there is no dispute that the letter was sent to and received by ARC, and it informed ARC that Igor Vladimirskiy was the Executive Officer of Selene Travel d/b/a Internet Global Travel with signature authority for banking and financial matters.

Vinogradova testified that after the sale of her travel agency to Vladimirskiy she no longer had any ownership interest in or operating responsibility for Selene Travel Corp. d/b/a Internet Global Travel. Vinogradova testified that upon the sale of her business to Vladimirskiy in or about March 1997 she closed the special bank account which she had utilized for Selene Travel Corp. She further testified that Vladimirskiy obtained an ARC nameplate for Internet Global Travel and opened a new special bank account to comply with the requirements of the ARA. She testified that after March 1997 she had nothing further to do with the business and that Vladimirskiy operated the business of Internet Global Travel without participation of any kind (either in ownership or operations) by Vinogradova. ARC, which had the authority to and did withdraw funds from Vladimirskiy's new Internet Global Travel special bank account, had available to it the documents and other evidence necessary to controvert Vinogradova's testimony in this regard, and no such evidence was proffered by ARC. Based upon her demeanor and her answers, particular-

ly to questions which a witness wishing dishonestly to avoid her contractual responsibilities might have answered differently without risk of gainsay, I conclude that Vinogradova was entirely spontaneous and candid in her testimony. Lacking any evidence to the contrary from ARC, I find the facts to be as set forth in this paragraph.

### Breach by Internet Global Travel Resulting in Loss to ARC

It appears that, with one minor exception in January 1998, Vladimirskiy managed the business of Internet Global Travel substantially within the rules and regulations of ARC and the ARA for approximately a year and a half after he acquired the travel business from Vinogradova. However, commencing in October 1998 Internet Global Travel began a course of conduct in clear breach of the agency's contractual and fiduciary obligations to ARC under the ARA by failing to report sales of ARC traffic documents on the required weekly sales reports and failing to deposit the proceeds from such sales in the Internet Global Travel special bank account so that ARC could disburse the funds from the special bank account to the airlines entitled to receive payment. Between mid-October 1998 and the end of December 1999 Internet Global Travel failed to report 214 separate ticket sales in its required weekly reports to ARC. Nine of the omitted transactions were in October 1998; ten transactions were omitted during January–March 1999; the great majority of the remainder were omitted during the last three months of 1999.[2] It appears that none of the proceeds from these 215 transactions were timely deposited in the special bank account.

---

**2.** In addition, one transaction was omitted from a weekly report in February 1998.

The aggregate value of the ticket sales which were not reported by Internet Global Travel amounted to some $258,581.02 (ARC's complaint in the Virginia District Court action, ¶ 23). After taking into account make-up payments by Internet Global Travel, the net loss to ARC resulting from the Internet Global Travel default was $197,281.02.

By letter dated July 24, 2000 addressed to "Internet Global Travel," ARC stated as follows:

> Be advised that Internet Global Travel ("IGT") has been extended until August 18, 2000 due, in part, to its partial payment being received at Airlines Reporting Corporation ("ARC").
>
> Please note that its ARC *accreditation will terminate* August 18, 2000 *unless,* on or before August 18, 2000 IGT pays in full its known indebtedness, or makes an additional *agreed upon* partial payment. (Emphasis in original)

In addition, the July 24, 2000 letter demanded a personal guarantee from "Elena Vinogradov" [sic], described as "100 percent shareholder in the corporation." Vinogradova did not provide the requested guarantee (it is not clear from the record that she ever received the letter or was informed of the demand for her guarantee), and it appears that no further payments on its indebtedness were made by Internet Global Travel. "On or about September 7, 2000, the ARA between ARC and Internet Global was terminated." (ARC complaint in the Virginia District Court action ¶ 24).

### The Core of ARC's Theory of Liability

ARC asserts that Vinogradova is liable to ARC for the $197,281.02 loss suffered by ARC based upon Vinogradova's alleged breach of contract, conversion and breach of fiduciary duty. Each of these legal theories will be examined in the Discussion section below. It will be helpful, however, to focus the analysis by reference to a single paragraph in ARC's trial brief which I believe fairly encapsulates ARC's theory that Vinogradova should be held liable for ARC's loss. At paragraph 23 on page 4 of its trial brief, ARC states:

> 23. Either Vinogradova remained the 100% owners [sic] and remained in control of the agency throughout its operation and the time the loss was incurred and is therefore responsible for fraud, a breach of her fiduciary duties, and conversion, or she handed over ARC's trust property to a stranger without the approval of ARC thereby wholly abdicating her fiduciary duties and converting ARC's property by denying it the ability to control the access to and issuance of tickets.

I have found as a fact that Vinogradova sold her interest in Selene Travel Corp. to Vladimirskiy in March 1997 and thereafter had nothing to do with the agency, which was operated from and after March or April 1997 by Vladimirskiy. The burden rested on ARC, as plaintiff, to prove the facts necessary to establish liability. ARC offered no evidence whatever to rebut Vinogradova's testimony that she sold the agency to Vladimirskiy in March 1997 and ceased to have anything to do with the business thereafter. Thus, the first postulate on which ARC relies for liability (that "Vinogradova remained the 100% owners [sic] and remained in control of the agency throughout its operation") must fail as a matter of fact for lack of proof.

Nor has ARC established the second, alternative, postulate of paragraph 23 relied upon by ARC to prove liability. The assertion that Vinogradova "handed over ARC's trust property to a stranger" was established by the evidence in only one limited respect. Vinogradova acknowledged in her testimony that she delivered

to Vladimirskiy whatever supply of ARC traffic documents she had on hand when she sold the agency to him in March 1997. These traffic documents constituted property held in trust by Vinogradova for ARC under the terms of the ARA. But there is no evidence whatever that Vladimirskiy and Internet Global Travel failed to include the sales of any of the traffic documents received from Vinogradova in March 1997 in Internet Global Travel's weekly sales reports or that any of the proceeds from those traffic documents were not deposited in the Internet Global Travel special bank account and remitted therefrom by ARC to the airlines entitled to the proceeds. To the contrary, such evidence as there was indicated that whatever supply of traffic documents Vladimirskiy received from Vinogradova would have been exhausted many times over long before the single transaction first unreported by Internet Global Travel (February 16, 1998, in the amount of $554) and even longer before the nine unreported transactions in October 1998 or the ten unreported transactions in January–March 1999. Of course, ARC has in its possession records of all traffic document deliveries to Selene Travel Corp. through March 1997 and to Internet Global Travel thereafter, and it would have been a simple matter to present evidence, if any existed, demonstrating that the traffic documents Vinogradova handed to Vladimirskiy resulted in unreported sales giving rise to any part of ARC's loss. No such evidence was presented.

Nor is there factual substance to the contention that by "hand[ing] over ARC's trust property to a stranger ... [Vinogradova denied ARC] the ability to control the access to and issuance of tickets." ARC knew that the name of the travel agency changed from Selene Travel Corp. to Internet Global Travel; that a new nameplate was issued by ARC to Internet Glob-

al Travel; that Vinogradova's special bank account was closed and that Internet Global Travel opened a new special bank account from which ARC thereafter withdrew funds for payment to the airlines; and, by June 2, 1997, that Vladimirskiy had assumed the position of Executive Officer with authority and signature rights for banking and financial matters. ARC had ample notice that something was materially changed with regard to Selene Travel Corp. d/b/a Internet Global Travel, and ARC knew the identity of the new Executive Officer of Internet Global Travel by early June 1997, long before Vladimirskiy's agency breached the ARA by failing to report nine transactions in October 1998.

In fact, although not disclosed by ARC at the trial in this adversary proceeding, court papers filed in ARC's Virginia District Court action which became known to this Court after trial reveal additional facts known to ARC before the end of 1997 which undermine the arguments of counsel in the case presented by ARC before this Court.

### ARC Disclosures in its Virginia District Court Action Against Vladimirskiy

Relying on the single reported decision which lends any support to its position in this adversary proceeding, *Airlines Reporting Corp. v. Inter Transit Travel*, 884 F.Supp. 83 (E.D.N.Y.1995), trial counsel for ARC argued forcefully that Vinogradova "set the stage for the misappropriation" by Vladimirskiy when she, in violation of her alleged contractual and fiduciary duties, handed her travel agency over to Vladimirskiy, a stranger to ARC, without informing ARC of the change in ownership and management. Central to ARC's theory was the argument of its counsel that Vinogradova's failure to inform ARC of the

change in ownership of her travel agency deprived ARC of its legal right and its ability to oversee who had access to its trust property. Thus, counsel asserted:

"[W]hat she did was she made misrepresentations so that a stranger to ARC was put in a position to continue to receive these documents and in fact, the defalcation was of her duty to ARC and allowed additional conversion on and on, and frankly, the conversion of ARC's legal right to oversee who had access to its property." (October 30 Transcript 11–12)

"Your Honor, my argument is that by entering into an agreement under which she agreed to take on fiduciary responsibility for the stock and proceeds, to walk away from that and never to go back when having set up a situation in which the beneficiary of the trust would think that she was still there and that they were still dealing with the same trustee that to walk away from that without putting any monitor in or anything in place to protect the ticket stock—all of the ticket stock was in trust, not just what was there, what continued to be sent by our understanding was being sent to its trustee who it had investigated and she had precluded them from learning was no longer there and to walk away and to do nothing to protect the ticket stock and proceeds is the breach of fiduciary duty." (October 31 Transcript 71–72)

"THE COURT: Let me ask you this before you move on to conversion, your position is—I'm asking you is your position that ARC had no notion that somebody new was running the show at Internet Global?

"MS. DOWLING: That's correct, Your Honor.

"ARC's records reflected no such thing. They reflected that it was the exact same corporation under a new name including the letter which we can—a letter came in saying that Igor could run things and I believe the testimony today was that they intentionally submitted that d/b/a at least to temporarily keep ARC from knowing that someone new was running the show so that they could keep a hand in it and, unfortunately, I think we wouldn't have been here today if that had been remedied by the next couple of steps being taken.

"THE COURT: ARC by your own acknowledgment knew that Igor was running the show in your words after receiving the letter.

"MS. DOWLING: No, Your Honor. The letter merely indicated that he was someone that could sign for the agency." (*Id.* at 76)

"[W]hat holds the trustee—and they investigated, under their contract that is the liable person and they reasonably rely on that until the[y] have reason to believe a different legal entity is in place and they can then choose to shut it down if it's an unauthorized entity or approve it if that process is gone through. Given the sheer volume of sales the system would not work if ARC had to investigate. As they pointed out, it went along fine for another year and a half. ARC had an agency that had been going alone fine from 1995 to 1997. It had no way to know that it went along fine for two years under Elena and two years under Igor. It went along fine as Celine [sic] Travel Corp. It went along fine as Celine [sic] Travel Corp. d/b/a Internet Global. There was no signal to ARC in March of 1997 that a new entity had taken over." (*Id.* at 77–78)

"Your Honor, nothing had come to ARC's attention that would have reasonably led it to believe that she [Vinogra-

dova] was no longer in charge of that corporation." (*Id.* at 78)

These contentions were stultified by ARC's submissions to the Virginia District Court in support of ARC's motion in that court for a default judgment against Vladimirskiy.

This Court learned that ARC had sued Vladimirskiy (as well as Selene Travel Corp. d/b/a Internet Global Travel, Elena Vinogradova and another individual in the United States District Court for the Eastern District of Virginia) at a pretrial conference shortly before trial. Since Vinogradova's attorney apparently had not obtained or even sought copies of any court papers in the Virginia District Court action, this Court asked ARC's counsel to provide the Court and Vinogradova's attorney with copies of ARC's complaint and the default judgment which was entered against Vladimirskiy in the Virginia District Court. Copies of the complaint, the Magistrate Judge's June 12, 2001 Report and Recommendation, the District Court's July 9, 2001 Order for a default judgment against Internet Global Travel and Vladimirskiy for $197,281.02 and the Default Judgment signed by the Deputy Clerk dated July 9, 2001 were submitted by ARC's counsel as an attachment to ARC's trial brief dated October 24, 2001 and received by this Court on the eve of the October 30–31 trial in this adversary proceeding. As a consequence, this Court (and, apparently, Vinogradova's attorney) did not have an opportunity to study the Virginia District Court papers until after the trial.

The Magistrate Judge's June 12, 2001 Report and Recommendation made reference to two affidavits of an ARC official named Donald C. Miller, submitted in support of ARC's default judgment against Vladimirskiy. By letter dated November 7, I directed ARC's counsel to provide the

Court and Vinogradova's attorney with copies of the Miller affidavits. This Court takes judicial notice of the ARC complaint, the Miller affidavits, the June 12, 2001 Report and Recommendation of the Magistrate Judge and the July 9, 2001 Order for default judgment of the District Judge in the Virginia District Court action.

The District Court's order of July 9, 2001 was based upon the June 12, 2001 "Report and Recommendation" by Magistrate Judge Barry R. Poretz. Judge Poretz' "Report and Recommendation" stated that ARC "has established the following facts by a preponderance of the evidence," upon "a full review of the submitted pleadings and proofs" (Report and Recommendation 2). Among the Magistrate Judge's findings of fact were the following:

(a) "defendant Igor Vladimirskiy ... is an executive officer of Internet Global and has held himself out as its president." (*Id.*);

(b) "in order to maintain accreditation and to reflect modifications in the ARA, Plaintiff periodically requires the travel agents to execute a Memorandum of Agreement to the ARA. In November 1997, Mr. Vladimirskiy directed an employee of Internet Global, Olga Savitskaia, to sign such an agreement, thereby binding Internet Global to the amended terms of the ARA. (Second Miller Aff. ¶ 5; *see also* Exhibit 1, attached to the Complaint.)" (*Id.* at 3);

(c) "Internet Global and Mr. Vladimirskiy ordered large numbers of ARC traffic documents from Plaintiff, ostensibly for use in accordance with the ARA. (Miller Aff. ¶ 31.) On numerous occasions, defendant Internet Global and Mr. Vladimirskiy failed to report all of the sales as required by the ARA and to make payment therefor...." (*Id.* at 3);

(d) "In January of 2000, Mr. Vladimirskiy, as president of Internet Global, sent a letter to Plaintiff acknowledging liability and promising to pay in full, (Miller Aff. ¶ 22), however, to date no such payment has been received by plaintiff." (*Id.* at 3–4).

The Magistrate Judge's finding in (b), based on ARC's own submissions to the Virginia District Court, that ARC "periodically requires the travel agents to execute a Memorandum of Agreement to the ARA," and (undisclosed by ARC's counsel to this Court) that in November 1997 Vladimirskiy directed his employee to sign a new Memorandum of Agreement to the ARA and submit it to ARC, utterly confounds the arguments of counsel that Vinogradova's failure to report the sale of her agency to Vladimirskiy deprived ARC of its ability to monitor who was in charge of the agency.

### Discussion

### I. *Liability*

ARC seeks to predicate liability on three traditional legal theories, the tort of conversion, breach of fiduciary duty and breach of contract. Each of these theories will be considered in light of the facts established at the trial. The Court will then turn to the case law relied upon by ARC.

Before doing so, however, it is well to reiterate the ultimate factual findings required by the evidence at trial, since it is from this factual matrix that the relevant legal analysis must proceed. The Court makes the following ultimate findings of fact:

1. In or about March 1997 Vinogradova sold her interest in Selene Travel Corp. to Vladimirskiy. Thereafter, Vinogradova had no ownership interest in the travel agency and played no role in its management or operation.

2. At all material times after his purchase of Selene Travel Corp. in or about March 1997, the principal of the travel agency was Vladimirskiy who held himself out as its Executive Officer and President. Vladimirskiy changed the name of the travel agency to Internet Global Travel (the name of his preexisting travel agency), obtained from ARC a new nameplate, opened a new special bank account from which ARC withdrew funds for payments to airlines in accordance with the ARA, caused the June 2, 1997 letter to be written to ARC notifying ARC that he was the new Executive Officer of the travel agency, and in November 1997 caused one of his employees to sign a Memorandum of Agreement (similar if not identical to the like document signed by Vinogradova in support of her application which was approved by ARC's December 7, 1995 letter) binding Internet Global Travel to the amended terms of the ARA.

3. In January 2000 Vladimirskiy as President of Internet Global Travel sent a letter to ARC acknowledging the liability for the debt owed by Internet Global Travel to ARC and promising to pay $5,000 a month until the debt was paid in full.

### A. *Conversion*

Although Vinogradova's attorney has not favored the Court with a trial brief and ARC's trial brief omits any discussion of the elements of the tort of conversion, the elements of such a claim may be briefly summarized.

▪ "Conversion is an unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d 883, 452 N.Y.S.2d 599 (1st Dep't.1982). *See also Schwartz v. Capital Liquidators, Inc.*, 984 F.2d 53 (2d Cir.

1993). "The tort of conversion is established when one who owns and has a right to possession of personal property proves that the property is in the unauthorized possession of another who has acted to exclude the rights of the owner." *Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 384, 626 N.Y.S.2d 472 (1st Dep't.1995).

■■■ An action for conversion cannot be maintained where the damages being sought are for a mere breach of contract. *Peters Griffin Woodward, Inc. v. WCSC, Inc.*, 88 A.D.2d at 884, 452 N.Y.S.2d 599. Where possession of the property is originally lawful, conversion does not occur until a demand to return the property has been made by the plaintiff and refused by the defendant, or until defendant disposes of the property. *White v. City of Mount Vernon*, 221 A.D.2d 345, 346, 633 N.Y.S.2d 369 (2d Dep't.1995).

■ A cause of action for conversion of money exists where there is "a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Manufacturers Hanover Trust Co. v. Chemical Bank*, 160 A.D.2d 113, 124, 559 N.Y.S.2d 704 (1st Dep't.1990). *See also Payne v. White*, 101 A.D.2d 975, 976, 477 N.Y.S.2d 456 (3d Dep't.1984); *Peters Griffin Woodward v. WCSC, Inc., supra.*

■ ARC has not supplied any evidence to support a claim for conversion against Vinogradova. Her involvement with Selene Travel Corp. d/b/a Internet Global Travel ended in March 1997, long before Internet Global's first failure to include a single sales transaction in a January 1998 weekly sales report and some eighteen months before Vladimirskiy's pattern of omitting sales of ARC traffic documents from weekly sales reports first commenced with nine such omissions in October 1998, followed by ten omissions during the first three months of 1999. There is no evidence that the ARC traffic documents which Vinogradova turned over to Vladimirskiy in March 1997 were unaccounted for; to the contrary, such evidence as there was on the point could only support a finding that the traffic documents which Vinogradova had in March 1997 were sold, reported in weekly sales reports and the proceeds paid over to ARC by Vladimirskiy long before January 1998. Vinogradova was never in possession of either the traffic documents or the sales proceeds therefrom which were the subject of ARC's loss, and she cannot be held liable for having converted those documents or sales proceeds.

**B.** *Breach of fiduciary duty*

■ Vinogradova's relationship with ARC was arm's length, commercial and contractual in nature. There is nothing inherently fiduciary in the relationship between ARC and the travel agents on the ARC-approved Agency List. If a fiduciary relationship is to be found, it must be predicated on the terms of the contract between the parties, specifically the ARA.

As appears from ARC's own submissions to this Court, the ARA purports to create a fiduciary relationship in only two respects: first, Section XII (D) of the ARA provides that "all ARC traffic documents ... supplied to the Agent shall be held in trust for ARC by the Agent...." Second, Sections VII(B) and VIII(A)(9) of the ARA provide, in substance, that proceeds of sales of ARC traffic documents (less the agent's commissions) are the property of the respective airlines and shall be held in trust by the agent until accounted for and paid to the airlines.

As shown above, all of the traffic documents and the proceeds thereof which were not reported on Internet Global Travel's weekly sales reports beginning in

October 1998 and which resulted in ARC's loss of $197,281.02, were issued to Internet Global Travel, and the proceeds were received by Internet Global Travel, or Vladimirskiy, at least eighteen months after Vinogradova sold the travel agency and had no further involvement in its affairs. Vinogradova cannot be held liable for breach of fiduciary duty in respect of traffic documents and proceeds which she never received, had control over or knowledge of, and with respect to which she committed no wrongdoing whatever.

### C. *Breach of contract*

At the conclusion of the trial, the Court asked ARC's counsel to specify which provisions of the ARA were claimed to have been violated by Vinogradova in support of ARC's claim for breach of contract. Each provision identified by counsel will be analyzed.

#### 1. *Section IV.D.1.a.*

 Section IV is entitled "QUALIFICATIONS FOR RETENTION ON THE AGENCY LIST," and begins with the preliminary language: "To be retained on the agency list, the Agent must continue to meet the following criteria:"

Subsections D.1.a. provide as follows:

1. The Agent is ineligible for retention on the agency list where investigation reveals that:

a. there was a material misrepresentation or inaccuracy in any application of the Agent for inclusion on the agency list*, or for changes to its status or listing thereon, or in any attachments thereto[.]

Assuming that the "CHANGE OF AGENCY NAME" form dated 3/21/97, which notified ARC of the change of name from Selene Travel Corp. to Internet Global Travel contained a material misrepresentation in answering "No" to the question "Is this name change part of a proposed ownership change?", and assuming that Ivan Kovalev, who signed the form, was acting as an agent for Vinogradova, the consequence of such a misrepresentation under the express terms of Section IV would be that Internet Global Travel would be "ineligible for retention on the agency list." There is nothing in Section IV, elsewhere in the ARA or in the law of contracts which would impose on Vinogradova liability for breach of contract on account of the error on the CHANGE OF AGENCY NAME form by her agent, whether intentional or not. Assuming that the error could be considered a breach of contract of this particular provision of the ARA (despite the fact that Section IV deals solely with eligibility), there is no evidence and no fact in the record to support the conclusion that the error or misrepresentation in the CHANGE OF AGENCY NAME form was a proximate cause of the financial difficulties, or defalcation, of Vladimirskiy and Internet Global Travel which did not even begin until eighteen months after Vinogradova sold the agency to Vladimirskiy.

#### 2. *Section VII.B.*

 This section, entitled "AGENT'S AUTHORITY, GENERAL RIGHTS AND OBLIGATIONS," requires an agent to designate a special bank account for the benefit of ARC and provides that the proceeds of sales of ARC traffic documents, as well as the traffic documents themselves, are held in trust until accounted for to the carrier. Vinogradova obviously cannot be held liable under this provision for breaches of contract or trust committed by Vladimirskiy in his operation of Internet Global Travel which did not commence until eighteen months after Vinogradova ceased to have any connection with Internet Global Travel.

### 3. *Section XI.C.*

 Section XI is entitled "LIABILITY AND WAIVER OF CLAIM." Subsection C provides in the first sentence (relied upon by ARC):

> C. The Agent will indemnify and hold harmless the carrier, its officers, agents and employees, from any and all damage, expense, or loss, on account of the loss, misapplication, theft, forgery, or unlawful use of ARC traffic documents, ARC-issued numbers or other supplies furnished by or on behalf of the carrier to the Agent.

This provision on its face does not apply, because the ARC traffic documents which were not reported by Vladimirskiy and his employees beginning in October 1998 were not "furnished by [ARC] to [Vinogradova]," who had left the travel agency eighteen months previously.

Moreover, ARC ignores the next sentence of subparagraph C, which expressly exonerates Vinogradova of liability here. It provides:

> However, the Agent *shall be relieved of liability for losses* arising from the proven theft or unlawful use, *except by the agent or his employees*, of ARC traffic documents . . . (emphasis supplied).

This sentence is fatal to ARC's theory of liability, since it makes clear that even an owner can not be held liable absent proof of personal involvement or control. The failure to report sales of traffic documents and misappropriation of proceeds here was not committed by Vinogradova or her employees, but by Vladimirskiy and his agents.

### 4. *Section XII.D.*

 This provision simply states that "All ARC traffic documents . . . supplied to the Agent shall be held in trust for ARC by the Agent. . . ." The traffic documents involved in ARC's loss were not issued to Vinogradova but to Vladimirskiy and his agency.

### 5. *Attachment G. Section II.A.*

 The ARA comprises thirty Sections in twenty-two single-spaced printed pages, seven Attachments lettered A–G comprising nine pages and two Supplementary Agreements comprising ten more pages. Attachment G is entitled "PROCEDURES TO CHANGE OWNERSHIP." Section II of Attachment G is entitled "TRANSFER OF 30% OR MORE OF THE SHARES IN A CORPORATION TO A NEW SHAREHOLDER(S)." Subsection A of Section II, upon which ARC relies, states as follows:

> A. The Agent shall:
>
> 1. submit a listing of name, residence address and telephone number of all shareholders including percentage of stock held by each;
>
> 2. submit a Personal History Form for each new shareholder, officer and director along with authorization by each individual to permit ARC to verify the information thereof; and
>
> 3. submit an application fee.

It is quite clear from the heading and text of Section II.A., considered in context with Section V (quoted below), that Section II is concerned solely with changes in shareholder identity *other than* conveyance of 100% of the shares of the travel agency to a new owner. Section II is clearly not applicable to a transfer of 100% interest in an ARC-approved agency.

Section V of Attachment G is the applicable provision, and it states as follows:

**SECTION V: ANY OWNERSHIP CHANGE OR TRANSFER NOT DESCRIBED ABOVE**

> A. Whenever the ownership of any authorized agency location is being

changed or transferred under circumstances not covered by the preceding provisions of this attachment G, *the new ownership shall:*

1. Submit an application in a form prescribed from time to time by ARC, containing evidence of compliance with all requirements for retention on the agency list;

2. Submit a bond or irrevocable bank letter of credit for the new entity in the amount required by section IV.A of this agreement;

3. Submit an executed memorandum of agreement reflecting the new entity;

4. Submit a Personal History Form for each owner, officer, director, and manager along with authorization by each individual to permit ARC to verify the information therein, in such form as may be prescribed by ARC;

5. Submit written acknowledgement by the Agent and the prospective owner(s) whereby ARC may require a satisfactory accounting of ARC traffic documents (paper format) and airline identification plates which are to be transferred to the new entity, and that the application will not be approved until all missing traffic documents (paper format) and all missing ARC-issued numbers (electronic format) and airline identification plates have been accounted for;

6. Submit a statement from the Agent and the purchaser concurring to the purchase. Withdrawal of the statement by either the Agent or the purchaser prior to approval will be considered withdrawal of the application; and

7. Submit an application fee.
(Emphasis supplied).

Two points should be made regarding this provision. First, the original or transferring "Agent" has certain written obligations to perform in connection with a 100% transfer of ownership, and these are spelled out in subsections 5 and 6 of subsection A. But the second and crucial point to note is that it is "the new ownership" that is required to submit an application in the form prescribed (subsection 1), together with a bond (subsection 2), an executed Memorandum of Agreement to the ARA (subsection 3), a Personal History Form (subsection 4), the application fee (subsection 7) and the "acknowledgment" and "statement" referred to in subsections 5 and 6.

Vinogradova testified that she obtained a change-of-ownership form from ARC, that she filled out her portions of the form (necessarily referring to subsections 5 and 6) and that she forwarded the form to Vladimirskiy to complete and send on to ARC. I have stated that Vinogradova's testimony was entirely credible, and I accept her testimony as truthful. If there was a breach of Attachment G, the breach was of Section V and it was a breach by Vladimirskiy, not Vinogradova.

### 6. *Section XX.A.*

Section XX of the ARA is entitled "TRANSFER OR ASSIGNMENT OF AGREEMENT, DEATHS AFFECTING OWNERSHIP, ABANDONMENT OF AUTHORIZED AGENCY LOCATION, TEMPORARY CLOSURE." Subsection A of Section XX provides, in pertinent part:

A. Change of Ownership

1. This Agreement may not be assigned or transferred by the Agent without the approval of ARC. Moreover, if 30% or more of the shares of stock,

cumulative, of the Agent have been sold or otherwise transferred (unless such Agent is an entity whose shares are listed on a securities exchange or are regularly traded in an over-the-counter market), ARC approval, *for purposes of retention on the ARC Agency List,* must be obtained.

2. Procedures for approval of changes of ownership are set forth in attachment G hereof . . . (emphasis supplied).

It is evident from the underscored language in the second sentence of this subsection that the requirement of ARC approval exists "for purposes of retention on the ARC Agency List," and is not intended (nor could it be) as an absolute prohibition on transfer of ownership. Moreover, as set forth in subsection 2, the "[p]rocedures for approval of changes of ownership are set forth in attachment G hereof" and as shown in the analysis immediately preceding Vinogradova did not violate the procedures set forth in attachment G.

### 7. Section VII.G. plus Section 60.11 of the ARC Industry Agents' Handbook

Finally, ARC's counsel points to Section VII.G. of the ARA, which provides as follows:

G. The Agent shall comply with all instructions consistent with this agreement properly issued to him by ARC in the *Industry Agents' Handbook* and other specific instructions consistent with this agreement provided from time to time by ARC.

The Industry Agents' Handbook is a massive collection of documents, approximately one-inch thick printed in single-space on both sides of paper measuring 8–1/2 × 11 inches. ARC relies upon Section 60.11 of the Industry Agents' Handbook comprising two full single-spaced printed pages, and specifically on the unnumbered third and fourth bullet points of the preliminary provisions in Section 60.11 under the heading "GENERAL INFORMATION." These bullet points read as follows:

● The ARC Agent Reporting Agreement (ARA) may not be assigned or transferred by the Agent, nor may 30% or more of the shares of stock, cumulative, of the Agent be sold or otherwise transferred without ARC approval. Possession of ARC traffic documents by a new owner prior to ARC approval will be subject to appropriate action by ARC.

● The specific criteria used by ARC in evaluating an application for change of ownership, and the details of the requirements for approval, are set forth in the ARA and contained in Section 80 of the Industry Agents' Handbook, and in the ARC Application Agreement (used in conjunction with Type V ownership changes). *Until such time as ARC enters into an Agent Reporting Agreement (ARA) with a new Agent (new owner) of an existing Agency location, the agent of record (current owner) remains responsible for all obligations that accrue through actions taken at or related to that location.*

(Emphasis supplied).

It is on this underscored sentence that ARC rests its contention that Vinogradova should be held liable to ARC on account of the $197,281.02 loss suffered as a consequence of Vladimirskiy's misappropriation which began eighteen months after he purchased the agency from Vinogradova.

On the record established at the trial in this adversary proceeding, there are at least four insuperable obstacles to ARC's claim of contract liability. First, as shown by the preceding analyses, ARC has not established any breach of the ARA by

Vinogradova in connection with the transfer of ownership by Vinogradova to Vladimirskiy or otherwise. Second, it would be an astonishing departure from fundamental principles of contract interpretation and basic notions of fairness to impose liability on Vinogradova based upon the underscored sentence buried deep in the bowels of the massive Industry Agents' Handbook in a section entitled "GENERAL INFORMATION FOR CHANGE OF OWNERSHIP APPLICATIONS" which does not itself contain any contractual obligations or procedures to be followed by either the current owner or the new owner in connection with an ownership change. Third, the "However . . ." sentence in Section XI.C of the ARA, discussed above in part I.C.3 of this decision, bars ARC's claim where neither the old owner, Vinogradova, nor her employees committed any wrongdoing in connection with the damages sustained by ARC. Fourth, as shown below, with the exception of a single aberrant decision, all of the case law relied upon by ARC stands for the proposition that Vinogradova cannot be held liable absent any evidence of wrongdoing on her part in connection with ARC's loss.

But there is a fifth reason why ARC's reliance on the underscored sentence in Section 60.11 must be rejected, grounded upon a fact known to ARC and its trial counsel but not disclosed to this Court during the adversary proceeding. The putative continuing liability of "the Agent of record (current owner)" continues only "[u]ntil such time as ARC enters into an Agent Reporting Agreement with a new Agent (new owner)." The second affidavit of Donald C. Miller, Senior Manager of Claims and Arbitration for ARC, submitted in ARC's Virginia District Court action in support of ARC's default judgment against Vladimirskiy, states as follows in paragraph 5:

5. On information and belief, in late 1997 Mr. Vladimirskiy directed an employee of Internet Global, Olga Savitskaia, to sign the Memorandum of Agreement, binding Internet Global to the amended terms of the Agent Reporting Agreement. A copy of the Memorandum of Agreement signed by Olga Savitskaia and the sworn declaration of Olga Savitskaia are attached as Exhibits 1–A and 1–B. (Declaration of Olga Savitskaia, ¶ 11)

In his Report and Recommendation on the basis of which the Virginia District Court ordered a default judgment against Vladimirskiy, Magistrate Judge Barry R. Poretz, made the following finding of fact:

In order to maintain accreditation and to reflect modifications in the ARA, Plaintiff periodically requires the travel agents to execute a Memorandum of Agreement to the ARA. In November of 1997, Mr. Vladimirskiy directed an employee of Internet Global, Olga Savitskaia, to sign such an agreement, thereby binding Internet Global to the amended terms of the ARA.

Thus, under the express terms of the underscored sentence in Section 60.11 Vinogradova's putative, continuing liability for obligations of Selene Travel Corp. d/b/a Internet Global Travel terminated upon the submission to ARC in or about November 1997 of a new Memorandum of Agreement signed upon the authority of Vladimirskiy and binding upon Internet Global Travel. The sworn statement in the affidavit of ARC's authorized agent, Donald C. Miller, and the finding of fact by Magistrate Judge Poretz, on the basis of which the District Court ordered entry of a default judgment against Vladimirskiy, are binding upon ARC under familiar principles of judicial estoppel and collateral estoppel.[3]

3. Surprisingly, it appears that neither Vino- gradova's attorney nor ARC's counsel con-

### D. *The legal authorities relied upon by ARC*

#### 1. *The general rule*

The cases relied upon by ARC do not support their position; rather, case after case hold that the defendant is not personally liable in the absence of evidence that he or she took an active role in the fraud, defalcation or conversion.[4]

ARC cites *Smith Barney, Inc. v. Strangie (In re Strangie)*, 192 F.3d 192 (1st Cir.1999) for the proposition that

A ... person controlling a corporation *and directing, or participating actively* in its operations may become subject to civil or criminal liability on principles of agency or of causation, ... where [the] corporation[ ] [was] formed, or availed of, to carry out the objectives and purposes of the ... persons *controlling* them.

192 F.3d at 196 (quoting from *My Bread Baking Co. v. Cumberland Farms*, 353 Mass. 614, 233 N.E.2d 748 (1968); alteration and emphasis in original). On its face, this precept does not support ARC's position, because ARC failed to show at trial that Vinogradova controlled, directed or participated actively in the acts of Internet Global which damaged ARC. *Strangie* affirmed the bankruptcy court's determination that the plaintiff "failed to demonstrate ... that [defendant] directly and knowingly participated in any alleged diversion" by the corporation (of which the defendant was an officer and director), and

refused to hold the defendant personally liable. 192 F.3d at 196.

In *Forastieri v. Eastern Air Lines*, 1983 WL 364564 at *3 (D.P.R. July 5, 1983) it was undisputed that "the individuals involved were the managers of the financial affairs of the corporate agency and that *they jointly held exclusive control* over the disposition of all funds that came into its possession." (emphasis supplied). However:

Whether or not this makes them individually liable for those funds as corporate officers depends on two factors, the first of which is the nature of the funds that came into their hands, and the second is the control they exercised over those funds.

*Id.* Acknowledging that "the personal liability *of officers participating in the conversion* of the funds held in trust has found clear judicial support," the Court set forth the following standard for liability:

We agree, therefore, that failure to remit funds collected by a corporate agent which belong to its principal airline gives rise to personal liability of those corporate employees *who participate in the conversion. The imposition of such liability presumes, however, that the responsible persons actually had possession or control over the property such that it could be said that their conduct constitutes participation.*

*Id.* at *5 (emphasis supplied). The Court concluded that the director-officers of the corporation were personally liable for

---

ducted any discovery of Vladimirskiy in this adversary proceeding. The evidentiary record available to this Court does not reveal whether the Memorandum of Agreement to the ARA which Vladimirskiy ordered Savitskaia to submit to ARC on behalf of Internet Global Travel late in 1997 was submitted pursuant to a request or demand by ARC or, if not, the reason why Vladimirskiy ordered such a submission to be made.

4. Two unpublished decisions cited in ARC's trial brief, *Airlines Reporting Corp. v. Specialty Travel, Inc.*, Civ. Act. No. 00–474–A (E.D.Va. May 12, 2000) and *In re Hashemizadeh*, A.P. No. 97–1266 (E.D.Va. Oct. 27, 1999), were not provided by ARC, and could not be obtained through on-line research. Accordingly, they were not considered by this Court.

those funds which were "actually received by and fell under the direct control of [the director-officers]," but not liable for other funds that "did not actually come into the possession of or fall under the control of [the director-officers] enough to be able to say that [the director-officers] herein participated in their conversion." *Id.* at *6.

The debtors in *Airlines Reporting Corp. v. Ellison (In re Ellison)*, 265 B.R. 539, 543 (Bankr.S.D.W.Va.1999), *aff'd*, No. 5:00–1067, slip. op. (S.D.W.Va. Sept. 20, 2001), were at all times officers and directors "in charge of daily operations" of the corporate entity which failed to file sales reports, caused checks to be dishonored and converted trust funds belonging to the plaintiff. The Court found that the debtors "were instrumental in the actions which constituted the defalcation, and thus must be held personally liable for their breach of fiduciary duty." *Id.* at 546.

In affirming the Bankruptcy Court's ruling in *In re Ellison*, the District Court noted "[T]here is specific authority that, in the context of the failure of a travel agency to remit funds collected from the sale of tickets, officers may be held personally liable *for personally participating in the conversion* of funds held in trust by the travel agency." *Ellison v. Airlines Reporting Corp. (In re Ellison)*, slip op. at 5 (emphasis supplied).

In *American Honda Finance Corp. v. Francis (In re Francis)*, 1993 WL 208236 at *1 (W.D.Va. Jan.14, 1993), Francis, acting on behalf of the corporate entity "allegedly sold 22 motorcycles 'out of trust' by not retaining the proceeds therefrom for Honda," and the proceeds "were instead put into [the corporation's] general operating account, from which Francis and his wife were paid a salary." Because Francis "was president and chief operating officer of the [corporation] *during the period in question,*" the Court held that a fiduciary relationship existed between Francis and Honda. *Id.* at *3 (emphasis supplied).

*Hemelt v. Pontier (In re Pontier)*, 165 B.R. 797 (Bankr.D.Md.1994), based the debtor's personal liability on the fact that "Mr. Pontier and his brother ... misrepresented to the plaintiffs that work on the house was substantially completed, and that based upon this misrepresentation, the plaintiffs made a 'final payment' to the debtor's company." *Id.* at 798. The Court contemplated that "If the officer takes no part in the commission of the tort committed by the corporation, he is not personally liable therefor *unless he specifically directed the particular act to be done, or participated or cooperated therein.*" *Id.* (emphasis supplied). Furthermore, "[T]o make an officer or corporation liable for the negligence of the corporation there must have been upon his part such a breach of duty as contributed to, or helped to bring about, the injury; *he must have been a participant in the wrongful act.*" *Id.* at 799. (emphasis supplied). The Court was careful to limit its holding to those situations where the debtor was either a participant or collaborator, or specifically directed that the act be done.

The debtor in *Global Express Money Orders v. Davis (In re Davis)*, 262 B.R. 673 (Bankr.E.D.Va.2001), was the manager and 90 percent equity owner of a corporate entity which diverted the plaintiff's proceeds to a general account, in breach of the trust agreement, and used those proceeds to pay operating expenses, including the debtor's salary. The debtor's submission of a false personal financial statement was held to be a proximate cause of the plaintiff's loss, and the Court found that:

Davis was well aware that [plaintiff's] trust funds were being commingled with [the corporation's] operating funds and used for general purposes of the busi-

ness; this was a defalcation, and it was permitted by Davis. He is wrong in saying that he did not personally gain from his corporation's use of the funds; if nothing else, he used [plaintiff's] funds to keep his corporation in business.

*Id.* at 685.

In *Airlines Reporting Corp. v. Bishop (In re Bishop)*, No. 7–00–00137, slip op. at 4 (Bankr.W.D.Va. March 6, 2001), the debtor, on behalf of Roanoke Travel & Cruise Services ("Roanoke"), entered into an agreement with an entity known as Occaquan, permitting Occaquan "to use the ARC Number and ticket printing capabilities" of Roanoke. *Id.* at 4. A percentage of the commissions resulting from Occaquan's ticket sales resulting from this arrangement were to be paid to Bishop's agency. However, due to "criminal manipulations" by Occaquan's principal, approximately $300,000 of airline tickets were issued for which neither the plaintiff, ARC, nor Roanoke was paid. The Court concluded that "The very basis of the relationship created between Roanoke and Occaquan ... constituted a blatant violation of the terms of Roanoke's agreement with ARC" and that "each issuance of a ticket by Roanoke to an Occaquan customer constituted a breach of trust under the Agent Reporting Agreement" with ARC. *Id.* at 8. Bishop was held personally liable:

> because he was personally involved in and authorized the agreement with Occaquan, the very essence of which was a breach of the obligations which his agency had assumed to ARC. In such situations it is well established that a corporate official who personally participates in a breach of trust by the corporation is personally responsible *for the consequences of his own conduct.*

*Id.* at 8–9 (emphasis supplied). However, while Roanoke's liability for the entire $300,000 was clear, the Court in *Bishop*

observed that "some of the discrepancies may have resulted from events for which Bishop personally is not responsible" and was unable to find without further facts that Bishop was personally liable for the entire $300,000. *Id.* at 9–10.

### 2. *The Inter Transit case*

The only case which supports the position proffered by ARC at trial is *Airlines Reporting Corp. v. Inter Transit Travel, Inc.*, 884 F.Supp. 83 (E.D.N.Y.1995) (hereafter *"Inter Transit "*). In *Inter Transit,* the defendant, Fuksman, on behalf of his agency, entered into an Agent Reporting Agreement with ARC, the plaintiff. The Court found that "the entire loss in question occurred after Fuksman agreed on November 29, 1990 to transfer his then 100% interest in Inter Transit to Willims, Hernandez and Rosales. Once those individuals entered the picture, over $200,000 disappeared." *Id.* at 86. Fuksman prepared a form reflecting the sale of the agency but "understood it was mailed to plaintiff by Willims." ARC never received the document. *Id.* at 85–86.

The Court first acknowledged the general rule that "It is axiomatic that an officer or director is not personally responsible to a third party for a corporate act of conversion *unless that individual was personally involved in the wrongdoing."* *Id.* at 87 (emphasis supplied). But, although it did not find that Fuksman was personally involved in the wrongdoing, the Court nevertheless found that Fuksman "set the stage" for the misappropriation of ARC's funds by selling his agency without obtaining ARC's approval, as purportedly required by the Agent Reporting Agreement:

> He, not the corporation, sold his stock and, in the process, placed the instruments of loss, *viz.* ARC's blank ticket stock and airline validation plates, in

unauthorized hands. He, as the sole shareholder of Inter Transit, undertook the task of notifying ARC of the change in ownership....

*Id.* at 87. Fuksman's "delinquency regarding notice" constituted a breach of contract, and the Court found that this was "relevant to the conversion claim" because

it prevented ARC from discovering that its property was being utilized by Willims, Hernandez and Rosales, and eviscerated its contractual right to pass upon the suitability of those three individuals to participate in its ticket sales program. Therefore, the conversion, as well as the breach of contract which is intertwined with that conversion, are each a proximate cause of plaintiff's loss, and *Fuksman was individually involved in both.*

*Id.* at 88 (emphasis supplied).

*Inter Transit's* holding, that the acts of a director which "set the stage" for someone else's misconduct can render him or her personally liable, was rejected by *Airlines Reporting Corp. v. Pishvaian,* 155 F.Supp.2d 659 (E.D.Va.2001). Pishvaian owned C.W. Travel, Inc., which entered into an ARA with ARC. Pishvaian gave complete control over the issuance of ticket stock to Price, the manager of C.W. Travel. No notice of personnel change was given to ARC, despite being required to do so by a provision in the Airline Reporting Agreement. Unbeknownst to Pishvaian, Price issued tickets and failed to report or pay for those tickets, causing losses to ARC of more than $400,000. ARC sued Pishvaian personally for conversion of the ticket stock, relying on *Inter Transit.* The Court responded:

Plaintiff, relying chiefly on New York authority, argues that defendant is liable himself for conversion, because he "set the stage" for C.W. Travel's conversion of the ticket stock when he failed (i) to

notify plaintiff that Price would be given access to the ticket stock, and (ii) to ensure that Price understood the Industry Agents' Handbook. *This argument is unpersuasive; under Virginia law, the facts in this case are insufficient to impose liability on defendant for the conversion of the ticket stock.*

155 F.Supp.2d at 666 (emphasis supplied). Because the Court interpreted Virginia law as holding an officer or director of a corporation liable "only for those intentional torts he or she commits or authorizes on behalf of the corporation," ARC was required to show that Pishvaian "participated in, ratified, or otherwise authorized the conversion." *Id.* Applying that standard, the Court found that Pishvaian "exerted no wrongful dominion over the ticket stock" and denied ARC's motion for summary judgment on the claim for conversion. *Id.* at 666–67.

This Court disagrees with the Eastern District of New York in *Inter Transit,* based upon the recitation of facts in that case. Upon those facts, under the "axiomatic" general rule no basis existed for a finding of conversion on the part of Fuksman, since there is no indication in the District Court's opinion that Fuksman had any participation at all in the misappropriation of traffic documents or sales proceeds. Nor did Fuksman commit breach of contract by his failure to deliver the change-of-ownership form to ARC, since Section V of Attachment G places the burden of submitting the application form on "the new ownership." This Court agrees with the analysis of the District Court for the Eastern District of Virginia in the *Pishvaian* case, which held that under Virginia law (the governing law of the ARA) ARC was required to show personal wrongdoing by Pishvaian. Lacking any authority to support the "set the stage" theory of liability for other people's mis-

conduct, I reject the *Inter Transit* decision as a basis for finding liability on the part of Vinogradova.

## II. *Non-dischargeability*

The conclusion that there is no basis for a finding of liability against Vinogradova obviously moots ARC's claim to non-dischargeability under 11 U.S.C. § 523(a)(2), (4) and (6). However, even if there were some colorable basis for holding Vinogradova liable to ARC for $197,281.02 under some theory of breach of contract, "setting the stage" for Vladimirskiy's peculation or some other theory of vicarious liability, there is no basis for non-dischargeability under any of the three subdivisions of Section 523(a).

### A. *Section 523(a)(2)*

■ Section 523(a)(2) provides, in material part:

(a) a discharge under section 727 ... does not discharge an individual debtor from any debt—

(2) for money, property ... to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud ...;

(B) use of a statement in writing—

. . . .

The only false pretenses or false representation that could be found as a fact based upon the evidence at trial was the Ivan Kovalev CHANGE OF AGENCY NAME form dated March 21, 1997, in which box "No" was checked in answer to the question "Is this name change part of a proposed ownership change?" Assuming that one rejects Kovalev's explanation and concludes that his answer to this question constituted a false representation, it is perfectly obvious that Vladimirskiy's failure to report sales of ARC traffic documents beginning in October 1998 and his subsequent failure to account to ARC for the proceeds of sales of those traffic documents did not result from Kovalev's misstatement. It is frivolous to contend that the misappropriated sales proceeds constituted "money ... obtained by" Kovalev's answer to question 5 on the CHANGE OF AGENCY NAME form within the meaning of subsection (2).

### B. *Section 523(a)(4)*

■ Section 523(a)(4) declares non-dischargeable any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny."

Vinogradova never had possession of or control over either the unreported traffic documents or the sales proceeds therefrom. Accordingly, there is no basis to assert that she was guilty of fraud, defalcation, embezzlement or larceny with respect to either the documents or the sales proceeds.

### C. *Section 523(a)(6)*

■ Subsection (6) of Section 523(a) holds non-dischargeable any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

The worst that can be said of Vinogradova's conduct on the evidence in this case is that she failed to see to it that Vladimirskiy complied with his obligation under Section V of Attachment G to submit the change-of-ownership form to ARC, and that she countenanced Kovalev's wrong answer to question 5 on the CHANGE OF AGENCY NAME form (assuming that she had any knowledge of Kovalev's erroneous answer, which was not established in the evidence). Neither of these acts, or rather omissions, was such as would necessarily or in the normal course result in any harm or damage to ARC, and indeed Vladimirskiy operated Internet Global Travel hon-

estly and in full compliance with the ARA for eighteen months before the first nine transactions were not reported in weekly sales reports in October 1998. There is no evidence that Vinogradova's reliance on Vladimirskiy to complete and send in the change-of-ownership form required of him under Section V of Attachment G were either likely or intended to cause harm to ARC, and there was nothing remotely willful or malicious in her conduct. ARC's claim under subsection (6) is baseless.

### Conclusion

For the reasons set forth above, this Court concludes that ARC has failed as a matter of fact and law to establish any basis for liability of Vinogradova to ARC in respect of the $197,281.02 loss suffered by ARC as a consequence of Vladimirskiy or his employees failing to report sales of traffic documents and account for the proceeds. Further, even assuming that there were some basis for holding Vinogradova liable to ARC for Vladimirskiy's defalcation, ARC has failed to prove any facts sufficient to establish that such debt is non-dischargeable under Section 523(a)(2), (4) or (6) of the Bankruptcy Code.

Vinogradova's attorney is hereby ordered to prepare, fax to ARC's local counsel for approval as to form (without prejudice to ARC's right of appeal) and deliver to the Court within ten days an order dismissing ARC's claims in this adversary proceeding with prejudice.